IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HENRYK OLEKSY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06 C 1245 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| GENERAL ELECTRIC COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Henryk Oleksy has sued General Electric Company ("GE," or "defendant") for infringement of U.S. Patent No. 6,449,529 (the "'529 Patent"). Defendant has counterclaimed for breach of a Patent, Proprietary Information and Waiver Agreement (the "Waiver Agreement") that plaintiff executed after a wholly owned subsidiary of defendant purchased the company for which plaintiff worked. Defendant has moved for summary judgment on the issues of ownership and "shop rights" in the patent in suit. For the reasons explained below, that motion is denied.

## FACTS

Plaintiff worked in various capacities at the Preferred Machine and Tool Products Corporation ("Old Preferred") plant in Bedford Park, Illinois from 1989 through 2000. On December 11, 1997, Granite Services, Inc., (a wholly owned subsidiary of defendant) formed Preferred Machine and Tool Products Corporation (formerly Preferred Machine Services, Inc.), a Delaware corporation ("New Preferred"). On January 5, 1998, New Preferred acquired the assets of plaintiff's employer, Old Preferred, an Illinois corporation, in exchange for $27 million cash. The cash for the purchase was provided to Granite by defendant immediately prior to the acquisition. Granite sold all of the outstanding shares of capital stock of New Preferred to

defendant for $27 million in September 1999. As of December 31, 2000, defendant transferred all outstanding shares of New Preferred capital stock to General Electric Energy Services, Inc. ("Services"), another of defendant's wholly owned subsidiaries. Defendant or one of its subsidiaries has owned all of the outstanding shares of capital stock of New Preferred since March 30, 1998.

Sometime in 1997, plaintiff began developing a computer numerical controlled dovetailing process for importing precise curvature on the "holding hooks" of pine-tree style steam turbine blades made at the Bedford Park plant. Plaintiff continued developing this process into 1998. He developed the process while at work, using Old Preferred time, machines, software, computers and other equipment, presumably with the knowledge and consent of his employer. Plaintiff continued with development, and use of company time and equipment, after January 5, 1998, when New Preferred became the owner of the plant.

Sometime between 1997 and April 23, 1998, plaintiff "offered" his process and ideas to his employer. On April 23, 1998, Richard Harvey, then president of New Preferred, sent plaintiff a memorandum indicating, "I am advising that you are free to take your manufacturing conceptual ideas to whomever would be most beneficial to you. We are not currently in a position to make the necessary changes to accommodate your process."

When New Preferred acquired the Bedford Park plant on January 5, 1998, all the Old Preferred employees were required to sign and return new personnel forms. Included among those forms was the Waiver Agreement. That Agreement provides in pertinent part:

A. <u>Invention and Records</u>

I will disclose and assign to GE as its exclusive property, all inventions and technical or business innovations developed or conceived by me solely or jointly with others during

2

the period of my assignment: (1) that are along the lines of businesses, work or investigations of GE or its affiliates to which my assignment relates or as to which I may receive information due to my assignment, or (2) that results from or are suggested by any work which I may do for GE; or (3) that are otherwise made through the use of GE time, facilities or materials.  I will execute all necessary papers and otherwise provide proper assistance (at GE's expense), during and subsequent to my assignment [to] enable GE to obtain for itself or its nominees, patents, copyrights, or other legal protection for such inventions or innovations in any and all countries.  I will make and maintain for GE adequate and current written records of all such inventions or innovations.

. . .

D.      Employment Status

I recognize that for the period of my Assignment, I shall be and remain an employee of my employer and shall not for any purpose whatsoever be considered an employee of GE or eligible for participation in any GE employee benefits, plans or programs, except for those benefits, plans or programs for which I may be eligible as a function of my previous employment with GE.

This Agreement supercedes and replaces any existing Agreement between GE and me relating generally to the same subject matter.  I[t] may not be modified or terminated, in whole or in part except in writing signed by an authorized representative of GE.  Discharge of my understanding in this Assignment shall be an obligation of my executors, administrators, or other legal representatives or assigns.

Concerned about his rights in the process he developed, rather than sign the Waiver Agreement when it was presented to him, plaintiff took it to his attorney for review.  Plaintiff also had some conversations in the Spring and Summer of 1998 with LeRoy Jewett, who had replaced Harvey at the Bedford Park shop, about New Preferred implementing plaintiff's process.  Jewett decided not to use plaintiff's computerized process.  On September 23, 1998, plaintiff's attorney, Leon Edelson, wrote to Jewett (sent by fax and mail) seeking to memorialize plaintiff's rights in what he termed the "bucket manufacturing process."  In that letter, Edelson indicated that plaintiff thought he had a verbal agreement with Jewett that plaintiff could retain the patent rights in the process.  According to the letter, plaintiff and Jewett met on July 13,

3

1998, at which meeting plaintiff informed Jewett that Harvey had granted a complete release of any claim of right by New Preferred to the process. Jewett apparently re-affirmed the release of patent rights but indicated an intent to retain a shop right in the process. Finally, Edelson's letter asked for Jewett to confirm that understanding by signing and returning a copy of the letter before plaintiff began the patent process. Jewett never signed the letter and, in a declaration filed in support of defendant's motion for summary judgment, states that he does not recall seeing it.

Receiving no response to his letter, in early November 1998 Edelson telephoned Robert Lampe, defendant's patent counsel, to confirm defendant's release of plaintiff's invention. According to Edelson, Lampe attempted to retract Harvey's April 23, 1998, memorandum. Edelson indicated that plaintiff would consider granting rights in the process to New Preferred if an agreement could be reached. Lampe indicated that he would propose language that would "satisfy all parties." On December 4, 1998, having received nothing from Lampe, Edelson sent him a follow-up letter stating, "to date we have not received the proposed language you were to forward to our attention" regarding plaintiff's patent rights. Lampe failed to respond to the second letter.

On December 30, 1998, plaintiff signed the Wavier Agreement and gave it to Kathy D'Mura the Human Resources manager at the Bedford Park shop. She kept a copy in his personnel file. That copy was not countersigned by defendant or plaintiff's employer, although the Wavier Agreement contained a line for such a signature. On January 5, 1999, plaintiff (through Edelson) filed the Provisional Patent Application for the '529 Patent. Five months later, on May 15, 1999, Edelson again wrote to Lampe seeking the proposed language that Lampe was to provide. Edelson ended that letter by stating "We must assume at this point that

you have no objection to Mr. Oleksy's invention and the prior release of any claims of rights to Mr. Oleksy as memorialized by Mr. Jewett and Mr. Harvey in their separate letters."

That letter apparently got defendant's attention, because on May 20, 1999, Lampe left Edelson a voicemail requesting that Edelson forward all correspondence between plaintiff and Harvey, Jewett and Lampe. Edelson responded to the request the following day by faxing Lampe a copy of the Harvey memorandum to plaintiff and all correspondence between himself and Lampe. He received no response to his fax.

On August 9, 2000, Edelson received a call from Ernest Cusick, another patent attorney with GE Power Services, who indicated that defendant might be interested in obtaining a license to plaintiff's invention. According to Edelson, Cusick told him that Cusick would memorialize defendant's position and get back to Edelson. Not hearing from Cusick, Edelson wrote to him on August 18, asking Cusick to memorialize GE Power Services' intention with regard to a license. Cusick responded by letter on August 28, indicating that "GE Power Systems is interested in retaining its rights in Mr. Oleksy's invention, which he developed while working at Preferred Machine and Tool Products Corp. As discussed with you, a license is one method for GE Power Systems to retain its rights." The letter went on to request certain information regarding plaintiff's patent application.

Edelson responded on September 18, 2000, informing Cusick that he had forwarded Cusick's letter to plaintiff and that he expected to have a response within the next few weeks. Edelson discussed the matter with plaintiff and on October 27, 2000, wrote to Cusick informing him that plaintiff was not interested in licensing the invention to defendant at that time.

5

Sometime in November 2000, plaintiff was asked to sign an Employee Innovation and Proprietary Information Agreement (the "IPI Agreement"), which contained obligations similar to those in the Waiver Agreement, requiring an employee to disclose and assign to GE as its exclusive property all inventions developed or conceived by the employee. Plaintiff took that agreement to Edelson, who drafted an addendum to it expressly excluding plaintiff's invention from the terms. Plaintiff never signed the agreement, however, and defendant later demanded that plaintiff sign the IPI Agreement without an addendum attached. On November 14, 2000, D'Mura wrote to plaintiff confirming a conversation on November 10, in which she informed plaintiff that execution of the IPI Agreement was a term and condition of his employment. The letter indicated that plaintiff was advised of the position of the company and that it was further clarified that the agreement would be effective from the date of his signature forward and would not govern any prior inventions, discoveries, innovations, improvements, trade secrets and technical or business information that was first developed, conceived, reduced to practice or authored prior to Friday, November 10, 2000. The letter indicated to plaintiff that if he failed to return to D'Mura a signed IPI Agreement by 5:00 p.m. on Monday, November 20, he would be terminated from employment.

On November 20, Edelson sent D'Mura, by fax and certified mail, a letter indicating that he had been given the agreement and D'Mura's November 14, 2000 letter. Edelson asked for a three week period, until December 8, 2000, to review the agreement and respond to the demand for execution by plaintiff. The letter further indicated that plaintiff believed that he had been terminated on Friday, November 10, 2000, because he was ordered to clear out his desk, gather personal belongings and turn in his cellphone. He was escorted off the premises and told not to

return. According to Edelson's letter, all of this was done after plaintiff had requested time for his attorney to review the IPI Agreement. On November 21, Lorene Schaefer responded to Edelson's letter to D'Mura. Schaefer indicated that a three week period to review the agreement was not reasonable but that the company was willing to extend its November 20 deadline by an additional ten days. The letter also indicated that plaintiff had been placed on unpaid leave of absence and that if he did not return a signed copy of the IPI to D'Mura by 5:00 p.m. on November 30, 2000, he would be terminated and removed from the company's payroll. Edelson responded to this letter the following day on November 22, 2000, listing out the facts as he and plaintiff saw them, and again requesting the three week period to review the IPI Agreement, that plaintiff continue to be paid during that period, and that plaintiff be provided with a copy of his personnel file. On November 27, 2000, Lisa Dooley, Operations Manager for Preferred, wrote to plaintiff advising that he was terminated effective that day.

The '529 Patent issued on September 10, 2002. On September 19, 2002, Edelson sent a letter to Lisa Moyles, another GE patent attorney, enclosing a copy of the '529 Patent and asking whether GE would be interested in obtaining a license to the invention. On October 9, plaintiff sent a letter to defendant's chief executive officer regarding defendant's interest in the '529 Patent. Cusick responded to that letter indicating that defendant had never assigned and had otherwise always retained its rights in the invention, and claimed that defendant had never authorized plaintiff "to act on his own to file any patent application on [defendant's] intellectual property." Cusick again sought information regarding the patent application and prosecution history. Edelson responded five days later indicating that the information was available from the United States Patent Office.

On November 25, 2002, Cusick wrote to Edelson indicating that defendant had no interest in the invention. The letter nonetheless went on to claim that defendant owned the rights to the invention by virtue of Granite's purchase of Old Preferred on or around January 5, 1998. Cusick's letter also indicated that Harvey had not been authorized to release patent rights with respect to the invention.

## DISCUSSION

Defendant has moved for summary judgment on the issues of ownership and shop rights in the '529 Patent, arguing first that it is the rightful owner of the patent because plaintiff is under an obligation to assign the patent pursuant to the Waiver Agreement. In the alternative, defendant claims to be entitled to a "shop right" in plaintiff's patent. Neither argument is persuasive.

Summary judgment is appropriate only when the material facts are undisputed and demonstrate that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of asserting the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and must support that assertion by citing to materials in the record. Fed. R. Civ. P. 56(c). Summary judgment should be denied, however, when reasonable minds can differ as to the import of the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986). In the instant case, the undisputed facts not only do not demonstrate that defendant is entitled to judgment on its counterclaim for breach of contract, but they suggest just the opposite.

Defendant argues that the only facts material to its counterclaim for breach of the Waiver Agreement are: (1) plaintiff began work on his process in 1997 while working at the Old

8

Preferred shop in Bedford Park; (2) defendant purchased the Old Preferred shop in January 1998; (3) plaintiff tested his process at the Old Preferred shop in the Winter of 1997 into the Spring of 1998; (4) plaintiff signed the Waiver Agreement on December 30, 1998, in which he agreed to assign inventions to defendant; and (5) plaintiff applied for the '529 Patent on January 5, 1999.[1]

Defendant's argument is far too simplistic and ignores other material facts, most of which are uncontested, which defeat its position. The Waiver Agreement (which was never executed by defendant) required plaintiff to disclose and assign to defendant all covered inventions. It also required plaintiff to execute all necessary papers at defendant's expense. It is undisputed that plaintiff disclosed his invention to defendant on a number of occasions. Each time, defendant told plaintiff that it was uninterested in the invention and the plaintiff was free to do with it what he wished. Harvey told that to plaintiff in his April 23, 1998, memorandum. In July 1998 Jewett told plaintiff that defendant was not interested in plaintiff's process. According to plaintiff, Jewett told plaintiff that he could retain the patent rights, but the company wanted to retain a shop right. At no time from the point when plaintiff developed the process until after plaintiff had been terminated did defendant ever claim ownership rights in the process or patent. Defendant never prepared assignment papers and never asked plaintiff to assign his rights over in his invention. Indeed, even in 2000, when plaintiff was refusing to sign the IPI Agreement,

---

[1] Plaintiff argues that defendant's counterclaim is barred by the statute of limitations. According to plaintiff, the statute began to run on September 11, 2002, when plaintiff emailed defendant and offered to license the '529 Patent to defendant. Plaintiff then argues that because there is no copy of the Waiver Agreement signed by defendant, it must be considered an oral contract subject to a five year statute of limitations. Even if plaintiff is correct, the counterclaim was timely filed under 735 ILCS 5/13-207, which provides that "a defendant may plead a set-off or counterclaim barred by the statute of limitations, while held and owned by him or her, to any action, the cause of which was owned by the plaintiff . . ., before such setoff or counterclaim was so barred . . . ."

plaintiff was lead to believe that the company was not interested in his invention. D'Mura's November 14, 2000, letter indicated that the IPI Agreement would be effective from the date of signature forward, and would not cover any prior invention.

In short, the record is replete with evidence that defendant disclosed his invention to defendant and that defendant repeatedly informed plaintiff that it had no interest in it. There is no evidence that defendant attempted to exercise its right to an assignment under the Waiver Agreement (assuming, as do the parties, that defendant had rights under an agreement defendant failed to sign) and certainly no evidence that plaintiff breached that agreement in any way. Accordingly, defendant's motion for summary judgment on its counterclaim for breach of contract is denied.

In the alternative, defendant argues that the undisputed evidence demonstrates that it retains a "shop right" in the invention of the '529 Patent and thus cannot be held to be an infringer. Once again, defendant ignores facts that defeat its motion.

A "shop right" is a right created at common law, when the circumstances demand it, under principles of equity and fairness, entitling an employer to use without charge an invention patented by one or more of its employees without liability for infringement. McElmurry v. Arkansas Power & Light Co., 995 F.2d 1576, 1580 (Fed. Cir. 1993). The "proper methodology for determining whether an employer has acquired a 'shop right' in a patented invention is to look at the totality of the circumstances on a case by case basis and determine whether the facts of a particular case demand, under principles of equity and fairness, a finding that a 'shop right' exists." Id. at 1581-2. In performing this analysis the court looks "to such factors as the circumstances surrounding the development of the patented invention and the inventor's

activities respecting that invention, once developed, to determine whether equity and fairness demand that the employer be allowed to use that invention in [its] business. Id.

In the instant case, it is unquestioned that plaintiff conceived, developed and perfected his invention on company time, using company materials. Those facts, standing alone, could justify a finding of a shop right. But those facts do not stand alone. Plaintiff brought his invention to defendant and Harvey, president of plaintiff's employer, told him that defendant had no interest. Indeed, as noted above, defendant through numerous principals and agents repeatedly told plaintiff that it had no interest in using his invention. Although defendant argues that there is no evidence that Harvey was intending to or had the authority to waive any shop right, there is equally no evidence that he did not. The April 23, 1998, memorandum would certainly lead a reasonable person to conclude that defendant was waiving any interest in the process, and there is ample evidence in the record to conclude that defendant waived all rights in the invention.

Additionally, as plaintiff argues, shop rights are equitable in nature and creatures of common law. Id. at 1580-81. They attach where the employment relationship does not involve any specific contractual provisions providing for the assignment of intellectual property. U.S. v. Dubilier Condenser Corp., 289 U.S. 178, 187-88 (1933). "Where those rights are allocated by contract, the common law doctrine is superceded." Jamesbury Corp. v. Worcester Valve Co., 443 F.2d 205, 214 (1st Cir. 1971).

In the instant case, defendant argues that plaintiff's employment relationship with New Preferred was specifically conditioned on his agreement to assign intellectual property rights. "Where an employment relationship specifically anticipates the development and assignment of

11

intellectual property and sets conditions for assignment, the equitable remedy of shop rights is inapplicable." Board of Trustees of Leland Stanford University v. Roche Molecular Systems, Inc., 2007 WL 608009 at *20 (N.D. Cal. 2007). Accordingly, to the extent that the Waiver Agreement applies to plaintiff's invention, the shop right doctrine does not.

## CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment is denied.


**ENTER:** May 23, 2011

*/s/ Robert W. Gettleman*
_____
**Robert W. Gettleman**
**United States District Judge**