IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRYK OLEKSY, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 6 C 1245 |
| ) | |
| GENERAL ELECTRIC COMPANY, ) | Judge Virginia M. Kendall |
| ) | |
| Defendant. ) | |

# MEMORANDUM OPINION AND ORDER

Plaintiff Henryk Oleksy filed this action against Defendant General Electric Co. ("GE") in March 2006. Oleksy alleges that GE infringed his patented method for determining machining instructions to cut the root sections of turbine blades. This protracted litigation continues to involve substantial motion practice and multiple discovery disputes. As explained herein, this Court: (1) grants in part and denies in part Oleksy's motion to compel and for sanctions with respect to "old code;" (2) denies Oleksy's motion for spoliation sanctions with respect to code sequences from GE's subsidiaries; (3) grants in part and denies in part each party's motion concerning the protective order[1]; and (4) continues GE's motion seeking leave to move for summary judgment.

## I.     Oleksy's Motion to Compel and for Sanctions – Old Code (Dkt. No. 342)

Oleksy's "old code" motion claims that GE did not comply with an order this Court issued to GE during a December 19, 2012, hearing that required GE to produce three complete samples of old code and three complete samples of new code (*see* Dkt. No. 295, Hr'g Tr. 54:10-

---

[1] Dkt. No. 502 is the corrected version of Dkt. No. 499.

19 and 55:17-21 (Dec. 19, 2012)). During its initial hearing on Oleksy's motion, this Court determined that an evidentiary hearing was necessary to determine whether spoliation occurred when GE failed to preserve certain information related to the manufacture of root sections of turbine blades. (*See* Dkt. No. 400, Hr'g Tr. 101:19-103:18 (July 23, 2013).) This Court identified three factual determinations necessary to its spoliation determination: (1) whether GE's old code was ephemeral; (2) whether industry standards required GE to preserve the old code; and (3) whether GE acted in bad faith by failing to preserve its old code. This Court held an evidentiary hearing on December 9-10, 2013, during which each side presented evidence related to Oleksy's motion.

### A.     Findings of Fact[2]

Oleksy worked at Preferred Machine & Tool Products Corporation in Bedford Park, Illinois. (Dkt. No. 382 at 2.) While there, he developed a computer-controlled process for improving the manufacture of turbine blades at the Bedford Park plant. (*Id.*) A turbine consists of a rotary wheel and turbine blades. (*Id.*) Root section components connect the turbine blades to the rotary wheel. (*Id.*) Specifically, projections on the interior surface of the root sections, called "hooks," attach to and hold the turbine blades to the rotary wheel. (*Id.*) Hook curvatures of root sections machined to specific dimensions prevent the blades from wobbling. (*Id.*) On April 23, 1998, which appears to be after Oleksy disclosed his process to his employer, Richard Harvey of Preferred Machine told Oleksy that Preferred Machine could not accommodate Oleksy's process and that Oleksy was free to take his process elsewhere. (PHX-035 at 3.)

---

[2] This Court identified undisputed material facts submitted by the parties in its Memorandum Opinion and Order dated June 26, 2013, which addressed the parties' cross motions for summary judgment. Citations to Dkt. No. 382 denote those undisputed material facts. Except for citations to docket entries, this Court bases all other findings of fact in this section on the testimony and evidence admitted during the evidentiary hearing on this motion.

Oleksy took his process to the United States Patent and Trademark Office, which issued U.S. Patent No. 6,449,529 ("the '529 Patent") to Oleksy on September 10, 2002. (*See* Dkt. No. 382 at 2.) The '529 Patent covers Oleksy's process, which is a method of determining the machining instructions for purposes of milling root sections of turbine blades. (*Id.*) This method uses a CNC milling machine to cut a concave internal hook in the root section of a turbine blade. (*Id.*)

After receiving his patent, Oleksy asked GE whether GE had any interest in licensing the '529 Patent. (*See*, *e.g.*, PHX-028.) GE told Oleksy that GE did not have any interest in licensing the '529 Patent and that GE did not use the process disclosed in the '529 Patent. (PHX-036.) As of December 3, 2002, Oleksy did not accuse GE's process for manufacturing root sections having a dovetail shape milled into them of infringement of the '529 Patent. (PHX-032.) Oleksy did not accuse GE of infringement until March 8, 2006, when he filed a complaint for patent infringement. (Dkt. No. 1.)

GE's process at its Bangor, Maine facility starts with a drawing. (Dkt. Nos. 495 and 496, Spoliation Hr'g Tr. 143:1-19.) An operator takes the pertinent information from the drawing and enters that information into a software program. (*Id.* at 143:25-145:9.) The operator also enters other pertinent information such as which machine will run the process into the software program. (*Id.* at 144:14-22.) The operator must also enter two measurements into the software program: the "X-Off" and the "Z-Off." (*Id.* at 145:11-14.) The X-Off and Z-Off essentially identify where the part to be machined is relative to the machine itself. (*Id.* at 145:17-146:17.)

After the operator enters the necessary information into the software program, the software program creates an .INP file. (*Id.* at 147:9-15.) The .INP file contains the information entered into the software program in a format that a second software program can read. (*Id.* at

3

147:16-19.) APT is the second software program. (*Id.* at 147:16-22.) APT takes the information entered, combines it with files related to the part to be made and the machine to be used, and produces three output files. (*Id.* at 147:20-22, 148:9-14, 149:3-8, 149:11-19, 149:23-24.) The first output file from the APT program is a .TAP file. (*Id.* at 149:25-150:1.) The .TAP file, or g-code, is the file that directs the machine in making the part. (*Id.* at 150:8-13.) The second output file from the APT program is the .ACL file, which lists the movement of the machine along the X, Y, and Z axes. (*Id.* at 155:12-22.) The third output file from the APT program is the .LST file, which catalogs the processing that occurred in the APT program. (*Id.* at 156:1-6.)

GE's process at its Bangor, Maine facility creates these four files—the .INP, .TAP, .ACL, and .LST files—every time GE uses its process to manufacture a dovetail root section or a batch of dovetail root sections. GE could have saved these files either manually or automatically. (*Id.* at 179:7-21.) Therefore, this Court finds that GE's old code was not ephemeral.

GE's practice at its Bangor, Maine facility since at least 2002 has been to overwrite these files every time it uses its process to manufacture a dovetail root section or a batch of dovetail root sections. (*Id.* at 176:24-177: 179:2-6; 229:25-230:7; 307:17-23). GE's practice of overwriting files every time GE used its process to manufacture a dovetail root section or a batch of dovetail root sections did not violate any industry standard. (*Id.* at 127:17-128:6; 318:5-7.) GE did not alter its practice in 2006 when Oleksy filed its lawsuit. (*Id.* at 260:3-20.)

### B. Legal Standard

In patent cases, district courts apply the law of the regional circuit when determining whether to impose discovery sanctions. *See*, *e.g.*, *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1380 (Fed. Cir. 2004) ("In reviewing sanction orders, this court applies the law of the regional circuit from which the case arose . . . .") District courts have broad discretion in discovery matters and may impose reasonable discovery sanctions. *James v. Hyatt Regency Chicago*, 707 F.3d 775, 784

(7th Cir. 2013). Under Fed. R. Civ. P. 37(b)(2), district courts may sanction parties that fail to obey a discovery order. Any discovery sanction must be proportionate to a party's discovery failure. *See Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009) ("the sanction imposed must be proportionate to the circumstances.")

One sanction permitted by Rule 37(b)(2) is "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." But this sanction, an adverse inference, requires a finding that a party intentionally destroyed evidence in bad faith. *See Northington v. H&M International*, 712 F.3d 1062, 1066 (7th Cir. 2013) (bad faith destruction of evidence is a required element for allowing an adverse inference). A party destroys evidence in bad faith when its purpose is to hide adverse information. *Faas v. Sears, Roebuck, & Co.*, 532 F.3d 633, 644 (7th Cir. 2008).

### C. Oleksy Has Not Shown Bad Faith on GE's Part

GE did not have a duty to preserve any materials before Oleksy filed his complaint on March 8, 2006. Prior to this date, Oleksy's communications with GE did not suggest litigation was forthcoming. In fact, Oleksy stated in correspondence concerning a potential license agreement between GE and Oleksy that "no allegation of infringement has been brought by us against GE at this time." (PHX-032.) With statements such as this, there was no reason for GE to anticipate litigation. Accordingly, GE did not have a duty to preserve anything prior to March 8, 2006. *See Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (party has no duty to preserve evidence because it had no reason to anticipate litigation); *see also McDaniel v. Loyola University Medical Center*, 13-CV-06500, 2014 WL 1775685, at *2 (N.D. Ill. May 5, 2014) ("A party has a duty to preserve evidence over which it had control and reasonably knew or could reasonably foresee was material to a potential legal action") (quotation omitted).

GE's duty to preserve material evidence arose, however, once Oleksy filed his complaint. Oleksy accused GE's process for manufacturing root sections having a dovetail shape milled into them of infringement. GE should have reasonably foreseen that the files created by its accused process would be material to this action. Yet GE continued to overwrite its files. Because GE should have preserved these files, it failed to preserve evidence material to this action.

But Oleksy has not shown that GE did so in bad faith. This precludes the adverse inference instruction that Oleksy seeks. "Simply establishing a duty to preserve evidence or even the negligent destruction of evidence does not automatically entitle a litigant to an adverse inference instruction in this circuit." *Bracey v. Grondin*, 712 F.3d 1012, 1020 (7th Cir. 2013) (district court did not err in declining to issue adverse inference instruction when movant did not establish bad faith). Here, Oleksy has shown that GE waited several months to issue its first document preservation notice. (Spoliation Hr'g Tr. 271:18-23.) Oleksy has also shown that GE failed to preserve all of the files created by its accused process from September 7, 2006, when Oleksy asked GE to produce files created by GE's accused process, until the point in 2009 when GE started preserving its files. (*Id.* at 278:1-279:25.) But Oleksy has not shown that GE failed to preserve these files to hide them from Oleksy. Rather, GE presented evidence that its standard practice was to overwrite the files each time it made a new batch. Consequently, Oleksy has not shown the necessary bad faith on GE's part to warrant an adverse instruction.

Nonetheless, a discovery sanction is appropriate here because GE failed to take sufficient efforts to preserve evidence material to this action. Together, the four files created by GE's accused process—the .INP, .TAP, .ACL, and .LST files—allows one to determine exactly how a given dovetail was created. (Spoliation Hr'g Tr. 194:9-18.) As a result, this evidence would have

been material to this action because it bears directly on the infringement inquiry. And not having this evidence may prejudice Oleksy.

Despite testimony that saving these files would have been disruptive to GE's business, GE has not provided an adequate justification as to why it could not have saved the files created by its accused process to a hard drive or server during the pendency of this action. Litigation can prove disruptive to business practices but that does not mean that a litigant may ignore the duty to preserve evidence. To the extent that the burden to GE was too great, it should have conferred with opposing counsel or sought relief from the Court instead of shunning its obligations.

Accordingly, this Court orders GE to recreate three complete sequences of old code based on dovetails made between 2006 and 2009.[3] This Court previously ordered GE to produce three prior samples and three current samples of complete sequences of code. (Dkt. No. 295, Hr'g Tr. 54:10-19.) This Court considers the "prior samples" to be "old code," which covers dovetails created between 2006 and 2009. Given that GE has not preserved complete sequence of code between 2006 and 2009, it shall reconstitute or recreate the code at its own cost. GE shall use drawings identified by Oleksy as the starting point for the three complete sequences it has to recreate, and use versions of the software programs appropriate for the date of the drawings. Oleksy may identify someone to observe the process. GE shall produce these recreated sequences within twenty-one days of this order. Further, the recreated sequences shall be viewed as representative of GE's process during the relevant period, which is consistent with a position GE has taken with respect to other samples of its code that it has produced in this action.

---

[3] Based on GE's representation, this Court understands that "it is possible to reconstruct substantially identical g-code from old machine drawings based on the drawings." (Dkt. No. 352 at 1-2.)

This Court notes that Oleksy also argued that the lost evidence was also relevant to the issue of damages in a position paper submitted at this Court's direction in advance of the evidentiary hearing (Dkt. No. 451 at 3) and at that hearing (Spoliation Hr'g Tr. 216:4-7). But Oleksy raised this argument after the parties had completed briefing the motion. Consequently, it did not factor in this Court's decision. Besides, Oleksy's motion sought compliance with this Court's previous order. That order called for the production of six samples of complete code sequences. As this Court understands Oleksy's argument, the objective is to discern the number of dovetails GE manufactured using the patented process. Six sample code sequences would not provide the necessary data to make that determination. Therefore, Oleksy's damages argument is not persuasive in this context.

Aside from the costs associated with reconstituting or recreating the old code, this Court will not shift any other costs associated with this motion. There has been a long-running dispute as to what constitutes a complete code sequence. Further, there were legitimate disputes as to when GE's duty to preserve arose and what qualifies as "old code." These circumstances render an award of expenses related to this motion unjust under Fed. R. Civ. P. 37(b)(2)(C).

## II. Oleksy's Motion for Spoliation Sanctions – Code from GE Subsidiaries (Dkt. No. 466)

Oleksy's subsidiaries motion (Dkt. No. 466) claims that GE did not produce complete code sequences for dovetails manufactured at three GE subsidiaries, Preferred Machine and Tool Products Corporation, Turbine Blading Limited, and GE Toshiba Turbine Components de Mexico S.R.L.de C.V. According to Oleksy, the missing data—CL Data—impedes his ability to analyze infringement and to prove damages. GE submitted affidavits stating that none of the subsidiaries created CL data files in the ordinary course of business. (*See* Dkt. No. 476-1, Ex. 1 at ¶¶ 3-4; Ex. 2 at ¶¶ 3-4; Ex. 3 at ¶¶ 5-8.) Yet according to Oleksy's expert, the software

programs used by GE's subsidiaries create CL data, which the programs then process into g-code, and "can create text files containing CL data." (Dkt. No. 466-2, Ex. CC at ¶¶ 6-9.) Even though they had the ability to do so, GE's subsidiaries did not take advantage of the feature that creates CL data files prior to this action. In this regard, GE's subsidiaries differ from the old code sequences discussed above that GE created at its Bangor, Maine facility but then overwrote. Generally, parties do not have an obligation to create documents or files to respond to a request for production. *See Riversource Life Ins. Co. v. Amy Plumbing, Heating & Cooling, Inc.*, 12 C 1388, 2013 WL 1110922, at *1 (N.D. Ill Mar. 15, 2013). Because GE subsidiaries did not create CL data files when manufacturing dovetails, this Court denies Oleksy's motion to compel.

Because the software programs used by GE's subsidiaries had the ability to create CL data files, Oleksy had a good-faith reason to question whether GE's subsidiaries had done so. As a result, this Court finds this motion substantially justified and will not award GE its reasonable expenses in opposing the motion. *See* Fed. R. Civ. P. 37(a)(5)(B).

### III.     Protective Order Motions (Dkt. Nos. 497, 499, and 502)

Both parties have filed motions related to Oleksy's alleged violations of the protective order entered in this case. GE claims that Oleksy deliberately violated the protective order by disclosing GE's confidential information to undisclosed experts who had not agreed to comply with the protective order. (*See* Dkt. No. 499.) Oleksy seeks protection from subpoenas issued by GE to individuals who received GE's confidential information without having agreed to comply with the protective order. (*See* Dkt. No. 497.) This Court grants both motions in part and denies them in part. This Court grants GE's motion to the extent that it finds that Oleksy violated the protective order but, as discussed below, denies GE most of the relief it seeks. This Court grants Oleksy's motion to the extent that it limits the discovery GE seeks to one four-hour deposition for each of the recently disclosed staff members of ITC Experts, Inc. ("the ITC staff"). Each

deposition may address the deponent's background and any tasks the deponent performed related to this case, provided the tasks produced facts or data that Dr. Caulfield relied on in forming the opinions expressed in his report. To facilitate these depositions, GE can issue an interrogatory to Oleksy seeking information concerning the facts or data received from the ITC Staff that Dr. Caulfield relied on in forming the opinions expressed in his report. GE cannot inquire as to any drafts exchanged or communications between any combination of Dr. Caulfield, the ITC Staff, and Oleksy.

This Court previously denied a motion by GE seeking to prevent Oleksy's disclosure of GE's confidential information to Oleksy's thirteenth and fourteenth expert witnesses. (Dkt. No. 461 at 1.) This Court declined to limit the number of experts but explained that the proposed experts must agree to comply with the protective order entered in this case. (*Id.*) That protective order permits "independent experts, consultants, or translators for each of the Parties and their clerical personnel . . . whose advice and consultation will be used by one of the Parties in connection with preparation for trial of this case" to view confidential information provided the individual agrees in writing to comply with the protective order and the party that retained the expert provides the other party with written notice. (Dkt. No. 83 at ¶ D.)

Oleksy disclosed its expert Dr. Edward M. Caulfield to GE. Dr. Caulfield signed an Undertaking to Comply with Protective Order. (Dkt. No. 497-1, Ex. A.) In his report, Dr. Caulfield states "I, along with the staff of ITC Experts, Inc. working at my direction, have evaluated the manufacturing method utilized by GE." (Dkt. No. 497-1, Ex. C at ¶ 8.) According to Dr. Caulfield, he arranged for staff members who worked with him at Packer Engineering—Nicole L. Schimpf, Dr. Kunihiro Nakamoto, Dr. Mark Fleming, Jean-Pierre Wolfe, Gregory R. Baker, John J. Stamm, and Kevin Jones—to work at ITC Experts, Inc.'s facility. (Dkt. No. 497-

10

1, Ex. L at ¶¶ 6-7.) Dr. Caulfield states that he did not have the corporate structure in place to employ his staff after Packer Engineering closed and once he started his new consulting company, Caulfield Engineering. (*Id.* at ¶¶ 5-6.)

Oleksy did not disclose the ITC Staff to GE. Oleksy claims that it did not have to disclose the ITC Staff because they did not offer their own opinions. Oleksy also claims that because the ITC Staff "merely assisted Dr. Caulfield," they are "clerical personnel" under the protective order in this case. But this is not an instance where a party failed to disclose a member of an expert's research team or a graduate student working for a professor, both instances where non-disclosure may prove reasonable. Rather, this is an instance where a party failed to disclose individuals working for a separate company and who, for the most part, could qualify as experts or consultants under the protective order in this case in their own right. Because they worked for a separate entity, Oleksy should have disclosed either ITC Experts as an entity or the ITC Staff individually.

Further, Oleksy's attempt to characterize the ITC Staff as Dr. Caulfield's "clerical personnel" under the protective order does not comport with the plain meaning of the term or the objectives of the protective order. The protective order requires disclosure to provide the other party with an opportunity to object to the disclosure of its confidential information to independent experts, consultants, or translators. The protective order recognizes that these individuals will likely have staff to perform routine tasks, such as copying, filing, and other administrative tasks. But there is no indication that any of the ITC Staff who assisted Dr. Caulfield performed routine tasks, whether clerical or technical. In short, Oleksy's claim that the ITC Staff who assisted Dr. Caulfield were *his* clerical personnel is untenable because they

11

worked for another company and because they were not clerical. Therefore, Oleksy violated the protective order by disclosing GE's confidential information to the ITC Staff.

Oleksy has since remedied its violation of the protective order by disclosing the ITC Staff to GE and providing GE with signed undertakings for each member of the ITC Staff. Nonetheless, this Court must consider whether a sanction is appropriate and, if so, what that sanction should be. *See Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009) (". . . the sanction imposed must be proportionate to the circumstances.") GE seeks to strike portions of Dr. Caulfield's expert report, discover the extent of Oleksy's unauthorized disclosures and to prevent further unauthorized disclosures, to have the ITC Staff return or destroy GE's confidential information, and recover its costs and attorneys' fees related to Oleksy's unauthorized disclosures.

Striking portions of Dr. Caulfield's expert report would be too harsh a sanction under the circumstances. GE claims that Oleksy's failure to disclose the ITC Staff prejudices GE because it deprives GE of the transparency provided by Fed. R. Civ. P. 26. But Rule 26 requires only that a party "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(2)(A). To the extent that Oleksy does not intend to call the ITC Staff at trial, there is no prejudice to GE under Rule 26. Further, GE may depose the ITC Staff who performed work for Dr. Caulfield related to this case to determine what tasks they performed for Dr. Caulfield and whether they performed those tasks competently, provided Dr. Caulfield relied on those efforts in formulating his opinion. *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612-613 (opposing party may depose assistants relied on by an expert in formulating his or her expert

opinion). This will ensure that GE has the opportunity to obtain the necessary information should it decide to challenge the admissibility of any of Dr. Caulfield's opinions.[4]

The only other prejudice GE experienced due to Oleksy's violation of the protective order is the discovery it conducted to determine the scope of the violation and the expenses incurred in bringing or responding to protective order related motions. But these efforts do not warrant striking portions of Dr. Caulfield's expert report or preventing Dr. Caulfield from relying on the work performed by the ITC Staff in formulating his opinions. Setting aside their general objection to the number of experts who have received its confidential information (*see* Dkt. No. 439), GE has not objected to the disclosure of its confidential information to the ITC Staff. GE has not identified any conflict or risk of harm implicated by the disclosure of its confidential information to the ITC Staff. Thus, Oleksy's violation of the protective order has not caused harm significant enough to warrant a sanction as severe as striking portions of Dr. Caulfield's expert report or preventing Dr. Caulfield from relying on the work performed by the ITC Staff in formulating his opinions.

A more appropriate sanction is to allow GE to recover its costs and attorneys' fees related to Oleksy's violation of the protective order. "Protective orders encourage parties to disclose sensitive material, lead to better-informed litigation and decisions, and reduce the costs and delays of litigation. Parties and their counsel must respect and comply with protective orders or these advantages are lost in current litigation and threatened in future litigation." *Tama Plastic Industry v. Pritchett Twine & Net Wrap, L.L.C.*, 1:11-CV-783-JMS-DKL, 2012 WL 1912578, at *5 (S.D. Ind. May 25, 2012). GE should not have had to file a motion to ensure Oleksy's

---

[4] To the extent that GE asked this Court to exclude any of Dr. Caulfield's opinions as unreliable (*see* Dkt. No. 502 at 10-12), this Court declines to do so at this time. GE can make its challenge to the admissibility of Dr. Caulfield's opinions at the appropriate time.

compliance with the protective order. Yet that is what GE had to do, as Oleksy's unauthorized disclosure of GE's confidential information to individuals not employed by Dr. Caulfield or his company and who had not agreed to the terms of the protective order forced GE either to accept the unauthorized disclosure of its confidential information or to seek relief from this Court. Because GE had good cause for its motion, and because it is an appropriate sanction for the prejudice GE suffered, this Court orders Oleksy to pay GE's reasonable expenses related to GE's motion, including attorney's fees, under Fed. R. Civ. P. 37(b)(2)(C). This includes the reasonable expenses GE incurred investigating Oleksy's violation of the protective order but not the expenses GE incurred responding to Oleksy's motion for a protective order. Under the circumstances, it would be unjust to award either party its expenses related to Oleksy's motion: GE issued overbroad discovery requests in response to Oleksy's protective order violation. Neither party is blameless with respect to Oleksy's motion.

This Court considered whether it should treat Oleksy's violation of the protective order as contempt of court under Fed. R. Civ. P. 37(b)(2)(A)(viii). It is unclear whether Oleksy's protective order violation was a mistake or an attempt to circumvent the protective order. On the one hand, Dr. Caulfield disclosed the ITC staff in his report. This precludes a finding of bad faith because it shows that neither Oleksy nor Caulfield tried to hide the ITC Staff from GE. Additionally, Oleksy's counsel claims that relationships and interactions with Dr. Caulfield led them to believe that the ITC Staff were Dr. Caulfield's staff. (Dkt. No. 514, Hr'g Tr. at 23:7-12, Apr. 23, 2014.) Dr. Caulfield introduced Oleksy's counsel to members of the ITC Staff as "his staff." (Dkt. No. 407 at 1.) It was not until months later that Oleksy's counsel learned that "Dr. Caulfield's staff" worked for ITC Experts, Inc. (Dkt. No. 407 at 1-2.) If circumstances led

Oleksy to reasonably believe that the ITC Staff were Dr. Caulfield's staff, then Oleksy's protective order violation was a harmless mistake.

On the other hand, one could infer that Oleksy was reluctant to seek leave to disclose GE's confidential information to the ITC Staff given GE's prior objections to the number of experts Oleksy has retained. Oleksy's argument that the ITC Staff qualify as Dr. Caulfield's clerical personnel under the protective order does not help. No reasonable reading of the protective order would allow one to extend the term "their clerical personnel" to include individuals employed by another company, and arguments to the contrary seem to be nothing more than an attempt to justify misconduct. The protective could not have led Oleksy to believe that the ITC Staff were Dr. Caulfield's staff, especially after Oleksy learned that neither Dr. Caulfield nor Caulfield Engineering employed the ITC Staff.

Questions remain that prevent finding Oleksy in civil contempt. It is unclear whether Oleksy's counsel learned the true nature of the relationship between Dr. Caulfield and the ITC Staff before or after GE filed its motion to enforce the protective order (Dkt. No. 439), in which GE voiced its concern over the number of experts Oleksy retained. It is also unclear how much time passed between the discovery by Oleksy's counsel that the ITC Staff worked for another company when GE first learned in March 2014 that the ITC Staff might have received its confidential information. Oleksy disclosed Dr. Caulfield to GE in August 2012. (*See* Dkt. No. 497 at 2.) Dr. Caulfield started working with members of the ITC Staff on this case as early as April 2013. (*See*, *e.g.*, Dkt. No. 497-2, Ex. 3 to Ex. M, Fleming Decl. at ¶ 6-7.) Oleksy served Dr. Caulfield's expert report in March 2014. (Dkt. No. 497 at 3.) At some point prior to March 2014, members of the ITC Staff received GE's confidential information from Dr. Caulfield (*see*, *e.g.*, Fleming Decl. at ¶ 7) and Oleksy's counsel learned that Dr. Caulfield or Caulfield

Engineering did not employ the ITC Staff. Because the sequence of events is unclear, this Court cannot determine whether a contempt finding is appropriate. Rather than order Oleksy to show cause as to why this Court should not find him in contempt, this Court admonishes Oleksy's counsel for its failure to disclose the ITC Staff under the protective order once they learned the true nature of the relationship between Dr. Caulfield, Caulfield Engineering, and the ITC Staff.

## IV. Motion Seeking Leave to Move for Summary Judgment (Dkt. No. 521)

GE seeks leave to move for summary judgment of noninfringement based on its belief that Oleksy's method requires a three-axis computer numerical control (CNC) milling machine. According to GE, this limitation means that the accused process, which uses a four-axis CNC milling machine, cannot infringe the asserted claims of the '529 Patent. Oleksy opposes GE's motion because the parties are in the middle of expert discovery and fears that allowing GE to proceed would further delay the case, and because he believes this Court has construed "at least a three-axis computer numerical control milling machine" to mean a multi-axis CNC milling machine that operates along *at least* three axes. The parties, however, did not identify "at least a three-axis computer numerical control milling machine" as a disputed claim term. (*See* Dkt. No. 322.) Because the claim term was not in dispute at the time, this Court did not construe it in its Memorandum Opinion and Order it entered on June 26, 2013. (*See* Dkt. No. 382 "Claim Construction Order".)

Any references to "at least a three-axis computer numerical control milling machine" in the Claim Construction Order were incidental to the issues addressed in that order. The first reference to this claim term was in a list of components used in combination to perform the claimed method. (Dkt. No. 382 at 3.) The second and third references to this claim term were in a discussion concerning whether the claimed method constituted patentable subject matter. (Dkt. No. 382 at 8; Dkt. No. 382 at n.2.) The fourth reference to this claim term was to construe a

16

disputed claim term that referred to "a machine." ((Dkt. No. 382 at 20-21.) None of these references suggests a construction of the claim term.

Given the parties disagreement as to the meaning of this claim term, as well as the potentially dispositive nature of this claim term, this Court will construe it. The parties shall file their proposed constructions for this time by August 5, 2014. Both parties should address whether a person of ordinary skill in the art would understand a multi-axis machine programmed to machine a part that requires movement along three axes to be a three-axis machine for purposes of that part. This Court will hold a claim construction hearing on this claim term on August 7, 2014 at 10 a.m. If either party intends to call a witness to testify at that hearing, it must disclose the names of any witnesses and the subject matter of their expected testimony to this Court and opposing counsel by August 5, 2013.

This Court continues GE's motion seeking leave to move for summary judgment pending resolution of this disputed claim term.

## **CONCLUSION**

For the reasons stated above, this Court:

Grants in part and denies in part Oleksy's motion to compel and for sanctions with respect to "old code" (Dkt. No. 342) because GE failed to preserve material evidence; GE shall reconstitute or recreate three complete sequences of old code based on dovetails made between 2006 and 2009 within twenty-one days of this Order;

Denies Oleksy's motion for spoliation sanctions with respect to code sequences from GE's subsidiaries (Dkt. No. 466) because GE subsidiaries did not create CL data files when manufacturing dovetails, which means there is nothing to produce;

Grants in part and denies in part Oleksy's motion for a protective order (Dkt. No. 497) because GE's subpoenas to the ITC Staff were overbroad; this Court limits any discovery related

17

to the ITC Staff to one interrogatory concerning the facts and data received by Dr. Caulfield from the ITC Staff that Dr. Caulfield relied on in forming his opinions and a four-hour deposition of each member of the ITC Staff concerning his or her background and information provided to Dr. Caulfield that he relied on in forming his opinions;

Grants in part and denies in part GE's motion seeking sanctions for a violation of the protective order (Dkt. Nos. 499 and 502) because Oleksy violated the protective order; Oleksy must pay GE's reasonable expenses related to GE's motion, including attorney's fees, as well as the reasonable expenses GE incurred investigating Oleksy's violation of the protective order;

Continues Dkt. No. 521 pending resolution of the disputed claim term "at least a three-axis computer numerical control milling machine"; the parties shall file their proposed constructions for this term by August 5, 2014; this Court will hold a claim construction hearing on this disputed term on August 7, 2014 at 10:00 am.

This Court does not intend for this claim construction issue to cause any further delay. The parties shall resume expert discovery immediately. The parties shall confer and submit a revised schedule within twenty-one days of this Order.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 1, 2014